Reef Corporation v. Commissioner. Reef Corporation (Successor in Name to Reef Fields Gasoline Corporation) v. Commissioner.
Reef Corp. v. Commissioner
Docket Nos. 788-63 and 789-63.
United States Tax Court
T.C. Memo 1965-72; 1965 Tax Ct. Memo LEXIS 257; 24 T.C.M. (CCH) 379; T.C.M. (RIA) 65072; March 31, 1965
*257 1. A transaction planned in detail to be in form a sale of RF Corporation stock by all stockholders thereof to a selected individual, the adoption by such individual of a plan for dissolution of RF Corporation, and a sale of all the RF assets to newly formed R Corporation, some of the stockholders of RF Corporation who owned all of the stock of R Corporation receiving notes for their RF stock, and other stockholders of RF Corporation receiving part cash, which cash came from RF, and part notes for their stock, did not constitute a recapitalization under sec. 368(a)(1)(E), I.R.C. 1954, or mere change of identity, form, or place of organization under sec. 368(a)(1)(F), I.R.C. 1954, so that a notice of deficiency sent by respondent to R Corporation as successor in name of RF Corporation for a full fiscal year and not the short taxable year terminating with the date of dissolution of RF Corporation was invalid. 2. The transaction did not, for Federal tax purposes, constitute a sale of stock to the selected individual but did constitute a reorganization under sec. 368(a)(1)(D), so that the assets transferred by RF to R have a substituted basis for depreciation to R based on their basis *258 to RF. 3. Notes of R Corporation pledged to secure notes given to the stockholders of R by the individual to whom they purportedly sold their stock are not true indebtednesses of R but rather represent an equity investment by the stockholders of R in that corporation, and the amount purportedly paid as interest on these notes by R is not deductible in computing R's taxable income. 4. Under sec. 248, R Corporation is entitled to amortize its expenses of incorporation over a period of 60 months and to deduct in its taxable period December 15, 1958, through June 30, 1959, the proportion of such expenses attributable to this period on the basis of such amortization. Homer L. Bruce, Esperson Bldg., Houston, Tex., and William C. Griffith, for the petitioner. Harold Friedman, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in the income tax of Reef Corporation for the period December 15, 1958, through June 30, 1959, in the amount of $70,695.18, and a deficiency in the income tax of Reef Corporation (successor in name to Reef Fields Gasoline Corporation) for the fiscal year July 1, 1958, through June 30, 1959, in the amount *259 of $111,894.40. Some of the issues have been disposed of by agreement of the parties, leaving for our decision the following: (1) Whether either or both of the notices of deficiency mailed to the petitioners in these cases are invalid because of being addressed to the same taxpayer, or if these notices are not considered as addressed to the same taxpayer whether the notice mailed to Reef Corporation (successor in name to Reef Fields Gasoline Corporation) is invalid because of being mailed either to a nonexistent entity or for an incorrect period. The determination of this issue is dependent upon the determination of whether Reef Corporation is a continuation of Reef Fields Gasoline Corporation through a recapitalization under section 368(a)(1)(E) of the Internal Revenue Code of 1954, [1] or a mere change of identity, form, or place of organization, however effected, under section 368(a)(1)(F). Two further issues, (a) whether Reef Fields Gasoline Corporation had ceased to exist for all purposes under the laws of the State of Texas prior to the date of mailing of the notice of deficiency and (b) whether *260 assessment or collection of the deficiency from Reef Corporation (successor in name to Reef Fields Gasoline Corporation) is barred by the statute of limitations, are likewise dependent upon the determination of whether Reef Corporation is a continuation of Reef Fields Gasoline Corporation under section 368(a)(1)(E) or section 368(a)(1)(F). The correctness of respondent's disallowance of certain expenses incident to the purported liquidation of Reef Fields Gasoline Corporation is reached only if the notice to Reef Corporation (successor in name to Reef Fields Gasoline Corporation) is determined to be a valid notice and the deficiency determined therein is held not to be barred by the statute of limitations. (2) If Reef Corporation is not a continuation of Reef Fields Gasoline Corporation under section 368(a)(1)(E) or section 368(a)(1)(F), is the proper basis for the determination of depreciation of the depreciable assets transferred by Reef Fields Gasoline Corporation to Reef Corporation the basis in the hands of Reef Fields Gasoline Corporation? This issue is dependent upon the determination of whether the transfer of these assets by Reef Fields Gasoline Corporation to Reef Corporation *261 was, for Federal income tax purposes, a sale of such assets or a transaction which constituted a reorganization under the provisions of section 368(a)(1)(D). (3) Whether notes of Reef Corporation, given to George Strong, Trustee, purportedly in payment for the assets of Reef Fields Gasoline Corporation, to the extent used by George Strong, Trustee, as security for his notes given to stockholders of the newly formed Reef Corporation, constituted a true indebtedness of Reef Corporation, the interest on which is deductible by that corporation, or in effect represented equity investment by these stockholders in Reef Corporation. (4) Whether Reef Corporation properly elected under section 248(a) to deduct its organizational expenditures over a period of years, and whether the amounts included in such organizational expenses to be so deducted were the type of expenses permitted by the statute to be so included. Findings of Fact Some of the facts have been stipulated and are found accordingly. Reef Fields Gasoline Corporation (hereinafter sometimes referred to as Reef Fields) was organized under the laws of the State of Texas on or about July 30, 1951. Its principal office address at all *262 times here relevant was 2138 Bank of the Southwest Building, Houston, Texas. Reef Fields kept its books and records and filed its Federal income tax returns on an accrual basis and for fiscal years ended June 30. On July 14, 1959, Reef Fields filed with the district director of internal revenue,austin, Texas, a Federal income tax return for the period July 1, 1958 through April 27, 1959, which return was marked "final return." Reef Corporation (hereinafter referred to as Reef) was incorporated on December 15, 1958, under the laws of the State of Delaware. On September 15, 1959, it filed with the district director of internal revenue, Austin, Texas, a corporation income tax return for the period December 15, 1958 through June 30, 1959, giving as its principal address 2138 Bank of the Southwest Building, Houston, Texas. Reef Fields was organized to operate a casinghead gas plant in certain oil fields in which a partnership, Butler, Miller & Lents, had acquired casinghead gas rights. After its organization Reef Fields engaged in the business of gathering and processing casinghead gas. In connection with this business, it operated a natural gasoline plant and related facilities in Holland *263 and Borden Counties, Texas, in which it owned an 84 percent interest. Casinghead gas is the gas which is produced from an oil well together with the oil. Prior to approximately 1946, this gas was usually burned in the oil field but beginning about that time plants were constructed through which the casinghead gas was run with the natural gasoline, butane, propane, and other byproducts being removed and the residue sold through gas pipe lines. Butler, Miller & Lents is a partnership composed of J. R. Butler (hereinafter referred to as Butler), Martin G. Miller (hereinafter referred to as Miller), and Max R. Lents (hereinafter referred to as Lents). Butler, Miller & Lents are consulting engineers who have been engaged individually and through various entities in all phases of the oil and gas business since 1949. Butler, Miller & Lents acquired certain rights to casinghead gas in two fields. Skelly Oil (hereinafter referred to as Skelly) and El Paso Natural Gas (hereinafter referred to as El Paso) were preparing to build casinghead gas plants in other fields. Butler, Miller & Lents arranged to take El Paso's place and further arranged to construct a joint plant in West Texas in which *264 Skelly would own a 16 percent interest, and Butler, Miller & Lents would own an 84 percent interest. The plant would process gas from the two fields covered by the Butler, Miller & Lents' rights and from two additional fields, one under contract with Skelly and one under contract with El Paso. Reef Fields was organized by Lents and two others and the rights of Butler, Miller & Lents in the four oil fields and in the arrangement with Skelly were transferred to Reef Fields pursuant to an agreement which provided for a management contract between Reef Fields and Butler, Miller & Lents. The management contract provided for a fixed fee plus net profit interest for Butler, Miller & Lents. Stock in Reef Fields was sold to various persons who had invested in other undertakings originated and managed by Butler, Miller & Lents. These stockholders took no active part in the management of Reef Fields. A portion of the net profits interest of Butler, Miller & Lents under the terms of their management contract was subsequently assigned to certain other shareholders which included John B. Atkins and J. B. Saunders. In order to construct its plant Reef Fields borrowed $3,500,000 at 4 3/4 percent interest *265 from the New York Life Insurance Company (hereinafter referred to as the Life Insurance Company). Reef Fields also borrowed approximately $900,000 from El Paso. Under the first mortgage arrangement, the mortgage securing the loan from the Life Insurance Company, dividends could not be paid while the first mortgage loan was outstanding. The firm of Butler, Miller & Lents retained active management control of Reef Fields. Reef Fields had made certain contracts with others to the effect that after recovery of the cost of its plant it was liable under various net profits participation contracts to the extent of approximately 40 percent of its net income. In July 1958 Reef Fields had outstanding 40,800 shares of common stock of a par value of $10 per share. Its earned surplus at June 30, 1958, was $1,353,456. By December 1958 the first mortgage held by Life Insurance Company had been paid down from $3,500,000 to $889,587. The second mortgage of $900,000 was owed at that time by Reef Fields to Carson and Company, that company having obtained the mortgage loan by assignment from El Paso. From the time of its incorporation, Lents was the active manager of Reef Fields and devoted substantially *266 all of his time to the corporation. Sometime in 1958 Lents discussed with Butler and Miller his desire to increase his ownership in Reef Fields, and he proposed to Butler and Miller that the three of them attempt to acquire control of Reef Fields. Butler, Miller, and Lents owned individually and directly the following number of the 40,800 outstanding shares of stock of Reef Fields: Shares
owned
Percentage
Butler
3,092
7.58
Miller
996
2.44
Lents
1,696
4.16
5,784
14.18 In addition, Butler, Miller, and Lents, or their immediate families, through trusts or other indirect forms of ownership, owned additional stock of Reef Fields. Various discussions were held among the stockholders of Reef Fields, particularly between Butler and various other shareholders, including Lawrence R. Favrot. Pursuant to these discussions the stock of Reef Fields was valued at $150 per share. The stockholders at first considered a plan under which Reef Fields would adopt a plan of liquidation, sell its assets to a newly formed corporation for the new corporation's notes, and then dissolve, distributing its cash and these notes to its stockholders. The stockholders of Reef Fields sought legal advice as to the tax consequences *267 of this procedure and were advised that if such a plan were followed they would receive a capital gain on the dissolution of Reef Fields, the entire amount of which would be subject to tax at the rate applicable to such gains. Lents and his partner and certain other shareholders were unwilling to proceed with a plan under which they would receive notes but be required to pay a tax on the capital gain realized. The stockholders were advised by counsel that a plan might be set up whereby tax at capital gain rate would be paid only at the time of receipt of the cash payment for stock of Reef Fields. To accomplish this, he suggested that the following steps be taken: The stockholders of Reef Fields would sell their stock to a third party and take his notes for the stock. After this transaction the third party as the sole stockholder of Reef Fields would have that corporation adopt a plan of liquidation under section 337 and thereafter sell its properties to a newly formed corporation in which Butler, Miller, and Lents would have a greater interest than they held in Reef Fields, the properties of Reef Fields to be sold to the new corporation in exchange for notes of the new corporation. *268 Reef Fields would then dissolve and distribute to the third party to whom its stock had been sold, the new corporation's notes and this third party could then pledge the new corporation's notes to secure his notes to the stockholders of Reef Fields who had sold their stock to the third party. The Reef Fields stockholders selling their stock to the third party could report capital gain on the installment method if they received less than 30 percent of their sales price in cash in 1958. On December 8, 1958, at the annual stockholders meeting of Reef Fields the bylaws of Reef Fields were amended to provide that members of the Board need not be stockholders, and the shareholders were informed that there was under consideration the possibility of the company adopting a plan of liquidation and thereafter selling all of its property and distributing its assets to its stockholders. The chairman of the meeting, Butler, who was president of Reef Fields, outlined in detail the general plan under which these matters would be accomplished and the meeting of the stockholders was adjourned to December 30, 1958. On the same day at a directors' meeting of Reef Fields the following were elected as *269 officers of the corporation: J. R. Butler, President Max R. Lents, Vice President and General Manager W. H. Simmons, Secretary Martin G. Miller, Assistant Secretary On December 16, 1958, copies of the following letter were sent over the signature of J. R. Butler to each of the stockholders of Reef Fields: I have taken up with you heretofore the matter of the stockholders of Reef Fields Gasoline Corporation selling their stock for $150.00 per share payable part cash and part notes and I am advised the proposed program is agreeable to all of you. The purpose of this letter is to give you in summary form an outline of the procedure to be followed. Reef Fields has 40,800 shares outstanding. One group (referred to for convenience as the Favrot Group) own 19,472 shares and the other group (referred to for convenience as the Butler Group) own 21,328 shares. The Butler Group are forming Reef Corporation, a Delaware corporation, and transferring to it 3,832 shares of Reef Fields stock in payment for Reef's stock of $500,000.00. This will leave the Butler Group with 17,496 shares in Reef Fields. As the Favrot Group desire to complete their sale in December, 1958, and the Butler Group their *270 sale in January, 1959, it is necessary to use an intermediary to purchase all of the Stock and this will be George Strong, Trustee, of Houston, Texas. It was originally contemplated that all stockholders would receive $25.00 per share in cash in December, 1958, and $37.50 cash in January, 1959, or a total of $2,550,000.00 in cash, and would receive notes for the remaining $62.50 per share or a total of $2,550,000.00, and beyond that would receive further notes at the rate of $25.00 per share totaling $1,020,000.00. However, it has not been feasible for the entire $2,550,000.00 cash to be paid. Consequently, in substance the Favrot Group will receive their $62.50 per share in cash or a total of $1,217,000.00 in December, 1958, and January, 1959, and the Butler Group will take notes for their $62.50 per share or a total of $1,333,000.00 (including that amount applicable to the 3,832 shares to be owned by Reef). There will be a mortgage to New York Life Insurance Company, and these notes to the Butler Group of $1,333,000.00 will be secured by a second mortgage and will be paid off prior to the remaining $2,550,000.00 of notes to be received by the Favrot Group and the Butler Group. On *271 December 30, 1958, Reef will make an agreement with Reef Fields to buy all of its properties effective February 28, 1959, and will give Reef Fields its notes as follows: Series A Note for
$1,093,500.00
Series B Note for
239,500.00
$1,333,000.00
Series C Note for
$2,310,500.00
Series D Note for
239,500.00
2,550,000.00
Series E Note for
$ 924,200.00
Series F Note for
95,800.00
1,020,000.00 The Series A and B Notes of $1,333,000.00 and the $1,217,000.00 in cash to be paid the Favrot Group total the $2,550,000.00 that was originally intended to be paid in cash. At the present time Reef Fields has a loan from New York Life Insurance Company, and the latter has tentatively agreed to increase this loan to $3,000,000.00. If this new loan is not consummated prior to December 30, 1958, then Reef will in addition to the above listed Notes pay Reef Fields $1,217,000.00 in cash, but, if the new loan is consummated by December 30, 1958, Reef will simply assume the additional loan and Reef Fields will have available out of the loan the $1,217,000.00 to distribute to the stockholders on liquidation. Since the contract of December 30, 1958, will be signed by the two corporations after Reef Fields adopts a plan of *272 liquidation, it will not be subject to any income tax liability on account of the sale. Accompanying this letter are offers from George Strong, Trustee, to the Favrot Group covering their sale in December, 1958, and to the Butler Group covering their sale in January, 1959. Under his offer to the Favrot Group, George Strong, Trustee, will: 1. Pay $486,800.00 in cash in 1958. 2. Pay $730,200.00 in cash in January, 1959. 3. Give them Series C Notes aggregating $1,217,000.00. 4. Give them Series E Notes aggregating $486,800.00. Under his offer to the Butler Group and Reef Corporation, he will deliver to the Butler Group his Series A Notes for $1,093,500, Series C Notes for 1,093,500.00 * and Series E Notes for 437,400.00 * and to Reef Corporation his Series B and Series D Notes for $239,500.00 each and his Series F Note for $95,800.00. Reef Fields will on January 9, 1959, distribute to George Strong, Trustee, as its sole stockholder $1,217,000.00 in cash (which will be the amount of the cash paid by him to the Favrot Group), and all of the Series A to F Notes of Reef. George Strong, Trustee, will then pledge the Reef Series A Note to secure his Series A Note to the Butler Group, pledge *273 the Reef Series C Note to secure his Series C Notes to the Favrot and Butler Groups, and pledge the Reef Series E Note to secure his Series E Notes to the Favrot and Butler Groups. George Strong, Trustee, will also pledge the Reef Series B, and Series D and Series F Notes to secure his Series B, Series D and Series F Notes, respectively, to Reef. There are enclosed for your ready reference a set of the George Strong, Trustee, Series A to F Notes (which he will deliver on the purchase of the stock) and two sets of the Reef Series A to F Notes, which will be pledged as above outlined to secure the Notes of George Strong, Trustee. The reason for these two sets of Reef Notes is as follows: If the new loan from New York Life Insurance Company is closed before December 30, 1958, the Reef set of notes simply referring to the existence of its mortgage will be used. If that New York Life Insurance Company loan is not closed by December 30, 1958, the other set of Reef Notes, authorizing a first mortgage to New York Life Insurance Company, will be used. There is enclosed a copy of the form of Pledge Agreement that George Strong, Trustee, will execute pledging Reef's Series A Note for $1,093,500.00 *274 to secure the payment of his Series A Notes aggregating $1,093,500.00. He will execute a similar Pledge Agreement pledging Reef's Series C Note for $2,310,500.00 to secure his Series C Notes aggregating $2,310,500.00, and a similar Pledge Agreement pledging Reef's Series E Note for $924,200.00 to secure his Series E Notes aggregating $924,200.00. Yours very truly, J. R. Butler * Petitioner's witnesses testified that the stockholders were advised that the figures 2,310,500 and 924,200 were in error and should have been 1,093,500 and 437,400, respectively. On December 11, 1958, W. H. Simmons, who was secretary of Reef Fields, as grantor, executed a trust instrument with George Strong as trustee under the terms of which W. H. Simmons transferred the sum of $10 to George Strong to be held in trust for the Favrot Foundation, and certain designated individuals including relatives of Butler, Miller, and Lents. George Strong is an attorney with offices at 2124 Bank of Southwest Building in Houston, Texas. On December 16, 1958, Butler sent a letter to the stockholders of Reef Fields who were to participate in ownership of Reef Corporation. His letter to the stockholders of Reef Fields who *275 were to become owners of Reef (hereinafter sometimes referred to as the Butler group of continuing shareholders) contains instructions in accordance with which shares of Reef Fields were to be exchanged for shares of Reef. On the same day George Strong mailed two letters to stockholders, one of which was addressed to stockholders selling shares in Reef Fields in December 1958, and the other to shareholders of Reef Fields selling in January 1959. These letters set out the various proposals and by their terms constituted an offer to buy the shares of those shareholders in Reef Fields selling in December 1958 (hereinafter referred to as the Favrot group) for cash and George Strong's notes, and an offer to buy the shares of those shareholders in Reef Fields selling in January 1959 (Butler group) for George Strong's notes. W. H. Simmons, secretary of Reef Fields and of Reef, handled all the details for Reef Fields, Reef, and George Strong in closing these transactions, including the issuance of Reef shares and the recording on the books of the corporations of the transfer of Reef Fields' shares and Reef's shares. W. H. Simmons also subsequently handled the payment by Reef of principal *276 and interest to George Strong and payments by George Strong of principal and interest to the note holders of George Strong, a loan of cash by Reef Fields to George Strong in the amount of $486,800, and payment in liquidation to George Strong by Reef Fields in the amount of $1,217,000 and repayment by George Strong to Reef Fields of the loan of $486,800. W. H. Simmons also closed the books and records of Reef Fields, opened new ones for Reef, and handled the books and records of George Strong, Trustee. The minutes of the meetings of stockholders of Reef Fields reflect that a meeting was held on December 30, 1958, at which time the stockholders approved a 5 1/2 percent loan from the New York Life Insurance Company in the amount of $3,000,000 due November 1, 1965, to be issued at the principal amount less the unpaid balance of the loan outstanding to Life Insurance Company. The minutes further reflect that the shareholders adopted a plan of complete liquidation under section 337 and authorized the officers of the corporation to execute a contract for the sale of all the assets of the corporation. The first meeting of the board of directors of Reef was convened at the offices of Reef Fields *277 at 2138 Bank of the Southwest Building on December 30, 1958. J. R. Butler was chosen chairman. The following officers were elected: J. R. Butler
President
Martin G. Miller
Vice President
Max R. Lents
Vice President
W. H. Simmons
Secretary-Treasurer
K. B. Ford
Assistant Secretary-
Treasurer On December 30, 1958, 3,832 shares of Reef Fields stock were transferred by 23 of Reef Fields shareholders (the Butler group) to Reef. Thereafter, 38,320 shares of common stock of Reef were transferred to these 23 shareholders of Reef Fields. No shares of common stock other than the 38,320 shares were issued by Reef at or during the period from its incorporation until subsequent to March 1959. At a later time on December 30, 1958, the meeting of the board of directors of Reef was reconvened and approved a contract between Reef and Reef Fields and the Series A to F Notes of Reef referred to therein. The contract had previously been executed on that same day by Reef Fields and was executed on the same day by Reef. This contract provided in part: 1. In consideration of the mutual agreements herein contained, Reef Fields hereby obligates itself to sell to Reef, and Reef hereby obligates itself to purchase from *278 Reef Fields, at the close of February 28, 1959, all property and assets of every kind and character then owned by Reef Fields. 2. In consideration of the sale of said assets and properties by Reef Fields, Reef has executed and delivered to Reef Fields its certain promissory notes of even date herewith payable to the order of Reef Fields as follows: a. Series A Note for
$1,093,500.00.
b. Series B Note for
$239,500.00.
c. Series C Note for
$2,310,500.00.
d. Series D Note for
$239,500.00.
e. Series E Note for
$924,200.00.
f. Series F Note for
$95,800.00. and will assume all liabilities of every kind and character of Reef Fields existing at the close of February 28, 1959, and will, upon the conveyance to it by Reef Fields of its said properties and assets, execute the mortgages referred to in its said Series A, Series B, Series C, Series D, Series E and Series F Notes. On December 30, 1958, owners of 19,472 shares of stock of Reef Fields transferred their shares to George Strong, Trustee. These shareholders, the Favrot group, received $486,800 on December 30, 1958. $730,200 on January 6, 1959, George Strong Series C Notes in the aggregate amount of $1,217,000, and the George Strong Series E Notes *279 in the aggregate amount of $486,800. These amounts were constituted as follows: Cost per
share
Total
December 30, 1958
$ 25.00
$ 486,800
January 6, 1959
37.50
730,200
George Strong Series C Notes
62.50
1,217.000
George Strong Series E Notes
25.00
486,800
$150.00
$2,920,800
The New York Life Insurance Company loan was consummated on December 30, 1958, and the net proceeds were deposited in the Bank of Southwest to the account of Reef Fields. After paying the amount still owing on the prior Life Insurance Company note and the payment of the Carson note, the proceeds available through the loan were $1,220,000. On December 30, 1958, George Strong, Trustee, disbursed to the stockholders of Reef Fields who transferred their shares in Reef Fields to him on that date the $486,800 which he had received on that day from Reef Fields. The liabilities of Reef Fields, including Federal tax liabilities, assumed by Reef aggregated $3,978,898.77. On January 6, 1959, the Butler group of stockholders of Reef Fields transferred 17,496 shares of Reef Fields stock to George Strong, Trustee. The group which transferred the shares on January 6, 1959, were to receive George Strong Series A to E Notes as follows: Series
Cost per share
Total
A
$ 62.50
$1,093,500
C
62.50
1,093,500
E
25.00
437,400
Total
$150.00
$2,624,400
*280 On the same day Reef transferred to George Strong, Trustee, the 3,832 shares of Reef Fields stock which had been transferred to it by the 23 shareholders of Reef Fields (the Butler group) and received from George Strong, Trustee, the following: Series
Cost per share
Total
B
$ 62.50
$239,500
D
62.50
239,500
F
25.00
95,800
$150.00
$574,800 On January 6, 1959, as a consequence of this transfer George Strong, Trustee, was the holder of record of all shares of Reef Fields stock. The shareholders of Reef Fields who had transferred their shares to George Strong, Trustee, had received cash in the amount of $1,217,000 and George Strong, Trustee, notes totaling $4,903,000 (either issued or to be issued) Also on January 6, 1959, Reef Corporation notes totaling $4,903,000 had been issued or were issued to Reef Fields. On January 6, 1959, Reef Fields transferred $730,200 to George Strong, Trustee, who paid this amount to the Favrot group of shareholders. The payment of $730,200 when added to the payment in December 1958 of $486,800 totals $1,217,000, the entire amount paid in cash to the Favrot group of Reef Fields shareholders. Reef Fields distributed the Series A to F Notes of Reef in the face amount of $4,903,000 *281 to George Strong, Trustee, on or about January 6, 1959. The Reef notes, Series A to F, were identical in amount to the George Strong, Trustee, Notes Series A to F, the only difference being in the interest rate reflected on the Series A to D Notes. The George Strong Trustee, notes, Series A and B, bore 5 1/2 percent interest and the Series C and D Notes, 6 percent interest. The Reef A and B Notes bore interest at 5 3/4 percent and the C and D Notes 6 1/4 percent. The Series E and F Notes of neither George Strong, Trustee, nor Reef bore any interest. The George Strong Series A Notes issued in the face amount of $1,093,500 were given to the Butler group on the basis of $62.50 per share, corresponding to payment in cash of the same amount to the Favrot group. The George Strong Series B Note in the amount of $239,500 was given to Reef computed on the basis of $62.50 per share on the transfer to George Strong, Trustee, of the shares of Reef Fields held by Reef. George Strong Series C Notes in the total amount of $2,310,500 were given to both the Favrot group and the Butler group computed on the basis of $62.50 per share. The George Strong Series D Note in the amount of $239,500 was given *282 to Reef computed on the basis of $62.50 per share on the transfer to George Strong, Trustee, of the share of Reef Fields held by Reef. The George Strong Series E Notes in the total amount of $924,200 were given to both the Favrot group and the Butler group computed on the basis of $25 per share. The George Strong Series F Notes in the amount of $95,800 were given to Reef computed on the basis of $25 per share on the transfer to George Strong, Trustee, of the shares of Reef Fields held by Reef. Reef gave notes to George Strong which corresponded exactly, with the exception of interest rates, as noted above, to those given by George Strong to the shareholders of Reef Fields. George Strong, Trustee, immediately executed separate pledge agreements under which he pledged the Reef Series A to F Notes to secure his Series A to F Notes. The trustee under all the pledge agreements was W. H. Simmons, the secretary of both Reef Fields and Reef. The pledge agreement provides that all payments of interest and principal under Reef notes, with the exception of the interest differential, were to be applied equally and ratably against the George Strong, Trustee, notes of the same series. On February *283 27, 1959, a deed was executed by Reef Fields to Reef conveying the property of Reef Fields to Reef. The debt to the Life Insurance Company was secured by a first mortgage on the property Reef Fields conveyed to Reef. Reef executed second, third, and forth mortgages to secure its notes, as follows: Series
Mortgage
A and B Notes
Second
C and D Notes
Third
E and F Notes
Fourth
The business which was being operated by Reef Fields as of February 28, 1959, when the properties were transferred continued to be operated without interruption, being operated on and after March 1, 1959, by Reef with the same management and employees as had operated the business for Reef Fields. There was no change in the nature or type of the business, the employees, the customers, or the management. The pension trust plan and profit sharing plan of Reef Fields were transferred to and adopted by Reef. The Life Insurance Company loan of $3,000,000 had a maturity date of November 1, 1965, and provided for payments of $37,500 per month plus an additional amount annually based on net profit. Payments could not be made on the notes secured by the second, third, or fourth mortgages until the notes secured by the first mortgage *284 were completely paid, unless annual net profits exceeded stated amounts. On completion of the payments of the notes secured by the first mortgage, the notes secured by the second mortgage became payable at the same rate as the first mortgage. Paragraph (d) of section 3.3 of the First Mortgage, as amended reads as follows: (d) Not to pay, directly or indirectly, the principal, or any part thereof, of any notes, bonds or other obligations of the Mortgagor issued as evidence of any funded debt, or any notes, bonds or other obligations given in renewal or substitution thereof, other than the Notes secured by this Mortgage, until all amounts of principal, premium, if any, interest, costs, charges and attorneys' fees (if any be due), under the terms of this Mortgage and the Notes secured hereby have been fully paid, and to cause any liens or mortgages given to secure any such funded debt, other than the Notes secured by this Mortgage, to be subordinate and inferior to the lien of this Mortgage; provided, however, nothing herein shall be deemed as preventing the Mortgagor from paying the note to J. R. Butler dated September 24, 1958 in the principal amount of $70,601. Not to pay, directly, *285 or indirectly, any interest on the Mortgagor's series of second mortgage, third mortgage and fourth mortgage notes issued under and secured by a second mortgage, third mortgage and fourth mortgage, respectively, referred to in paragraph 2 of Section 3.4 hereof, or on any notes given in renewal or substitution thereof, if an Event of Default shall have happened under this Mortgage until such event of default shall have been cured. The George Strong, Trustee, notes all contained the following provision: In the event the said Series [A, B, C, D, E, or F] Note of Reef above referred to is received by the maker hereof and the maker hereof executes said pledge agreement above referred to, the maker shall be relieved from all personal liability for the payment of this Note, both principal and interest and, anything herein to the contrary notwithstanding, the principal of and interest upon these Series [A, B, C, D, or F] Notes shall become due and payable proportionately as the principal of and interest upon said Series [A, B, C, D, E, or F] Note of Reef becomes due and payable. On its Federal income tax return for the period July 1, 1958, to April 27, 1959, Reef Fields reported a nontaxable *286 gain of $3,828,860.09 on the sale of its property to Reef, as shown on the schedule below: Cost of property
$10,026,329.26
Less: Allowed depreciation
4,973,290.58
Adjusted basis
$ 5,053,038.68
Notes issued
$ 4,903,000.00
Liability assumed
3,978,898.77
Total sale price
$ 8,881,898.77
Less: Adjusted basis
5,053,038.68
Gain
$ 3,828,860.09 Attached to this return was the following: A STATEMENT ATTACHED TO AND MADE PART OF FINAL UNITED STATES CORPORATION INCOME TAX RETURN FOR THE PERIOD BEGINNING JULY 1, 1958, AND ENDING APRIL 27, 1959 Information Required by Regulations 1.337-5 Concerning Assets Sold After Adoption of Plan of Liquidation A plan of liquidation was adopted by the stockholders on December 30, 1958. A copy of the minutes of the stockholders meeting which includes the plan of liquidation is attached to this return. A natural gasoline plant and facilities, automotive equipment, land, warehouse stock, and notes and accounts receivable were sold February 28, 1959, as detailed on Schedule M, Item 4. The final liquidating distribution was made April 27, 1959. Under date of April 27, 1959, the Secretary of State of the State of Texas issued a Certificate of Dissolution of Reef Fields Gasoline Corporation. *287 The balance sheets of Reef Fields as of June 30, 1958, and of Reef as of June 30, 1959, as reflected by the Federal income tax returns filed with the Commissioner of Internal Revenue are as follows: Beginning of Taxable Year
End of Taxable Year
per Return of Reef Fields
per return of Reef
Amount
Total
Amount
Total
ASSETS
Cash
$ 155,003.94
$ 432,888.38
Notes and accounts receivable
$ 157,266.67
$1,301,851.62
(a) Less: Reserve for bad debts
157,266.67
1,301,851.62
Inventories: (a) Other than last-in, first out
70,894.58
95,350.05
(b) Last-in, first out
70,894.58
95,350.05
Prepaid expenses and supplies
46,403.31
56,361.86
Investments in governmental obligations
Mort. and real est. loans
Other investments
Bldgs. and other fixed depreciable assets
8,866,699.37
7,661,185.49
(a) Less: Accum. amort. and depreciation
4,612,829.89
4,253,869.48
256,343.75
7,404,841.74
Depletable assets
(a) Less: Accum. depletion
Land (net of any amort.)
16,384.12
13,735.15
Intangible assets
(a) Less: Accum. amort.
Other assets
Total Assets
$4,699,822.10
$9,305,028.80
LIABILITIES AND CAPITAL
Accounts payable
$ 160,828.40
$ 722,301.95
Deposits and withdrawable shares
21,600.00
Bonds, notes, and mort. payable, etc.
500,000.00
450,000.00
Accrued expenses
49,283.53
154,430.43
Bonds, notes, and mort. payable, etc.
2,060,587.15
7,303,000.00
Other liabilities - Fed. Income Taxes
146,067.00
Deferred
95,800.00
Capital stock: (a) Preferred stock
(b) Common stock
$ 408,000.00
408,000.00
$ 500,000.00
500,000.00
Paid-in or capital surplus
4,200.00
Surplus reserves
Earned surplus and undiv. profits
1,353,456.02
75,296.42
Total Liabilities and Capital
$4,699,822.10
$9,305,028.80
*288 Sometime in December of 1958 an oral commitment had been made to some individuals who were employees of Reef Fields or Butler, Miller & Lents that they would be permitted to subscribe to 1,680 shares of certain stock of Reef Corporation. Written subscription agreements were not entered into until March 1959. The employees were issued the stock when they paid for it sometime after March 1959. At the time of trial the 1,680 shares of stock had been paid for and issued. Sometime in 1962 through a refinancing agreement with Life Insurance Company the Reef Series A note and a part of the Reef Series C note were paid off and the Reef Series B and D Notes were either cancelled or paid. The notes Reef acquired in 1962 were acquired at a 20 percent discount from face value. After this refinancing, all the remaining notes, as before the refinancing, were subordinate to the Life Insurance Company loan. Of the $2,310,500 of Reef Series C Notes, $1,505,000 remain unpaid. The Series E and F Notes are still outstanding. The unpaid notes of George Strong, Trustee, still outstanding are in the hands of their owners and the unpaid Reef notes are still held by Simmons as trustee under the pledge agreement *289 to secure the notes. In connection with its incorporation Reef incurred legal expenses and other organizational expenses in the amount of $1,327.77. On its Federal income tax return for the fiscal period December 15, 1958, to June 30, 1959, Reef elected to treat as deferred expenditures its organizational expenses incurred during that taxable period. A statement attached to Reef's return reads in part as follows: Taxpayer incurred organizational expenditures in the total amount of $1,327.77 representing legal fees and other costs incident to the incorporation of corporation. Such expenditures are to be deducted ratably over a period of 60 months, beginning with March 1959, the month in which taxpayer began business. Reef claimed a deduction for organizational expenditures of $88.52 for this period. Under date of December 21, 1962, respondent issued a statutory notice to Reef Corporation for the period December 15, 1958, to June 30, 1959. In this notice respondent made the following adjustments which are in issue here: (a) Disallowance of a portion of the deduction claimed for depreciation; (b) disallowance of the deduction claimed for organizational expenses; (c) disallowance of the *290 deduction for interest claimed on Reef notes securing George Strong, Trustee, notes payable to Reef stockholders; and (d) disallowance of the deduction for that portion of interest on Reef notes payable to George Strong, Trustee, securing George Strong, Trustee, notes payable to Reef which exceeds the interest on the notes secured thereby. Respondent explained his determination by stating that Reef Corporation's basis for depreciation and amortization is the same as that of Reef Fields Gasoline Corporation and that the expenses in connection with its organization and interest on notes given as a part of the alleged purchase price of the assets of Reef Fields Gasoline Corporation are nondeductible, further explaining the disallowed interest deduction as follows: You deducted the sum of $65,610.00 as interest on your Series A and C Notes payable to your stockholders. This amount is determined to constitute dividends when paid rather than interest. On December 21, 1962, respondent mailed a notice of deficiency to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) for the fiscal year ended June 30, 1959. Respondent explained his determination as follows: It is determined *291 that the series of transactions which occurred commencing in 1958 and ending in April 1959, and involving you and Reef Fields Gasoline Corporation, did not in substance create a new taxpayer but constituted a mere change of name or a reorganization. The corporate existence of Reef Fields Gasoline Corporation for tax purposes is determined to have continued in the name of Reef Corporation. As a result the following adjustments are required: (1) The fiscal year of the "new" corporation arising from the reincorporation has been disregarded. (2) The increased basis in assets claimed by Reef Corporation based on the alleged purchase from Reef Fields Gasoline Corporation has been disallowed; the basis allowed is the basis of the assets in "Reef Fields Gasoline Corporation." (3) Expenses incurred relating to the above-described transaction have been determined to be nondeductible. In the notice of deficiency respondent combined the taxable income as disclosed on the return filed by Reef Fields as its final return with the income reported on the return filed by Reef as its first return and determined that the taxable income as reported on the two returns should be increased by the disallowance *292 of a part of the deduction claimed for depreciation, the same amount of interest deduction as had been disallowed in the deficiency notice addressed to Reef Corporation, and an amount of $65,740.85 designated as "Rein-corporation expense." Ultimate Facts Reef Corporation was not a continuation of Reef Fields Gasoline Corporation as recapitalized or merely changed in identity, form, or place of organization. Reef Fields Gasoline Company was dissolved on April 27, 1959. Reef Corporation is a separate corporate entity from Reef Fields Gasoline Corporation. The transfer of stock by the shareholders of Reef Fields to George Strong, Trustee, did not constitute a sale for Federal income tax purposes. George Strong, Trustee, was an intermediary and a mere conduit in a planned transaction and his presence is to be ignored for purposes of determining whether a reorganization took place. The business of Reef Fields continued substantially unchanged in Reef. Reef Fields transferred substantially all of its assets to Reef. The transactions commencing in December 1958 and concluding in March 1959 involving Reef Fields, Reef, George Strong, Trustee, and the shareholders of Reef Fields and Reef *293 were interrelated steps in a plan of reorganization. Reef Corporation Series A to F Notes in the hands of the stockholders of Reef Corporation (the Butler group) do not constitute true indebtedness for Federal income tax purposes. Opinion Petitioner has questioned the validity of the notices of deficiency issued to Reef Corporation and to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation), contending that these notices were mailed to the same taxpayer simultaneously and therefore both notices are invalid under section 6212(c) which restricts the mailing of further deficiency notices where the taxpayer to whom a notice is mailed files a petition to this Court within the time prescribed by statute. See Agnes McCue, 1 T.C. 986 (1943). Since, if petitioner is correct that no valid deficiency notice was mailed to either petitioner, we lack jurisdiction to make any determination in either of these cases, this issue is an appropriate one to dispose of before proceeding to discuss the remaining issues in the case. We have set forth in some detail the statements in respondent's notices of deficiency and on the basis of these statements we conclude: (1) That the notice *294 addressed to Reef Corporation was addressed to that corporation as a new legal entity for its proper first taxable period and the determinations made therein were predicated on the receipt by that new corporation of assets previously owned by a separate corporate entity, Reef Fields Gasoline Corporation, in a reorganization to which subchapter C of chapter 1 of the Internal Revenue Code, dealing with corporate organizations and reorganizations, applies. (2) That the notice to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) was sent to Reef Fields Gasoline Corporation, a continuing entity under the name of Reef Corporation, for the entire fiscal year which had been used by Reef Fields in keeping its books and records and filing its income tax returns based on respondent's determination that Reef Fields Gasoline Corporation's corporate entity had not in fact ceased but had been continued with a mere change in name or reincorporation or recapitalization. The two determinations are inconsistent since there could not be a new corporation formed with a new beginning taxable period to which the assets of a prior separate entity were transferred and also a continuation *295 of the prior entity with merely a change in name or place of incorporation or recapitalization with a taxable year which includes the period after the transfer of the assets to the new corporation. Therefore, we conclude that both notices cannot be valid notices of deficiency. Since these notices were sent to different legal entities, if either such corporation is in fact a proper taxable entity and the notice sent to it is for the proper taxable year of that corporation, that notice is valid. See Harvey Coal Corporation, 12 T.C. 596 (1949). Reef filed its income tax return on the theory that it was a new corporation organized on December 15, 1958, filing its first return for the taxable period from the date of its organization to June 30, 1959, as a short taxable year in accordance with section 443(a)(2). Reef Fields filed a final return for the taxable period from July 1, 1958, through April 27, 1959, a short taxable year under section 443(a)(2) on the theory that it was dissolved on April 27, 1959. If, in fact, these two corporations were one and the same for Federal income tax purposes with Reef Fields Gasoline Corporation merely continuing under the name of Reef Corporation, *296 respondent would be correct in his notice of deficiency sent to the continuing entity, since respondent must determine a deficiency for the proper taxable year or period of the taxpayer even though the taxpayer's return is improperly filed. See San Francisco Hotel Co., 19 B.T.A. 383 (1930). On the other hand, if, in fact, Reef Corporation is a new taxable entity even though it may have acquired its assets from Reef Fields in a transaction to which subchapter C of chapter 1 of the Internal Revenue Code of 1954, dealing with corporate organizations and reorganizations, is applicable, it properly filed its return for the short taxable year commencing with its organization on December 15, 1958. If Reef Fields is a separate entity from Reef and was in substance dissolved on April 27, 1959, after the transfer of its assets to Reef, it properly filed a return for a short taxable year ending at the date of its dissolution on April 27, 1959, under section 443(a)(2), and respondent has not validly determined a deficiency against Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) on the theory of a continuing entity and for the fiscal year July 1, 1958, through June 30, *297 1959. See Atlas Oil & Refining Corporation, 22 T.C. 552 (1954); Atlas Oil & Refining Corporation, 17 T.C. 733 (1951); Columbia River Orchards, Inc., 15 T.C. 253 (1950); Cyrus H. K. Curtis, 36 B.T.A. 899 (1937); Oklahoma Contracting Corporation, 35 B.T.A. 232 (1937); Pittsburgh & West Virginia Railway Co., 32 B.T.A. 66 (1935); Elgin Compress Co., 31 B.T.A. 273 (1934). Cf. California Brewing Assn., 43 B.T.A. 721 (1941). Respondent's argument that his notice addressed to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) is valid is premised on his contention that the transactions whereby assets of Reef Fields were transferred to Reef constituted a recapitalization under section 368(a)(1)(E) or a mere change in identity, form, or place of organization under section 368(a)(1)(F). The transaction that here occurred, as shown by our findings, effected more than a reshuffling of assets among the same stockholders or a mere change in name, form, or place of organization. After these transactions occurred the former Favrot group of stockholders owned none of the issued stock of the new corporation and had notes to represent the portion of their previously owned *298 stock for which cash had not been paid. These facts do not support "that reshuffling of a capital structure within the framework of an existing corporation contemplated by the term 'recapitalization'" under section 368(a)(1)(E). Helvering v. Southwest Corp., 315 U.S. 194 (1942), rehearing denied 315 U.S. 829, petition for rehearing denied 316 U.S. 710. The changes that occurred in the proprietary interests are such that there was more than a "mere change in identity, form, or place of organization" within the meaning of section 368(a)(1)(F). Joseph C. Gallagher, 39 T.C. 144 (1962), and Estate of James F. Suter, 29 T.C. 244, 258 (1957). This shift in proprietary interest distinguishes this case from Pridemark, Inc., 42 T.C. 510 (1964), on appeal (C.A. 4, Aug. 23, 1964). Cf. Hyman H. Berghash, 43 T.C. 743 (Mar. 11, 1965). Respondent, in arguing that there was a recapitalization or a mere change in identity, form, or place of organization of Reef Fields, states that the transaction can be viewed as a redemption of stock of the Favrot group, and thereafter a continuation of the business operations of Reef Fields under the name of Reef Corporation with exactly the same stock *299 ownership, thus constituting a mere change in name and place of incorporation of the corporation. The difficulty with respondent's position is that the shift in proprietary interest was inherently a part of the overall plan whereby the stockholders of Reef Fields who became stockholders of Reef continued to have the equitable ownership of the business and the stockholders who received cash and notes for their stock in Reef Fields ceased to have an equitable ownership in the business. Lents, in his testimony, referred to the Favrot group as the "stockholders who sold out." At least insofar as the Reef notes are concerned, respondent in his deficiency notices did not question that the Favrot group had "sold out" since his disallowance of interest deduction with respect to the Reef notes was only as to those notes securing notes held by the stockholders of Reef (the Butler group). In our opinion respondent's attempt to segregate from the entire transaction the "selling out" by the Favrot group of their equity interest in the business is no more valid than is petitioner's contention that each step in the entire transaction should be considered separately from the result achieved by the *300 entire transaction. We have held on numerous occasions that a transaction must be viewed as a whole and a determination made on the basis of the situation as it existed at the beginning and end of the complete transaction. James Armour, Inc., 43 T.C. 295 (1964), and cases there cited; John G. Moffatt, 42 T.C. 558 (1964), on appeal (C.A. 9, Aug. 28, 1964); and David T. Grubbs, 39 T.C. 42 (1962). Under circumstances where the proprietary interests of certain stockholders are eliminated or substantially changed, the transaction, if it is to come within the provisions of the reorganization sections, under circumstances such as are present here, must qualify under section 368(a)(1)(D) (formerly section 112(g)(1)(D) of the Internal Revenue Code of 1939). Pebble Springs Distilling Co., 23 T.C. 196 (1954), affd. 231 F. 2d 288 (C.A. 7, 1956), certiorari denied 352 U.S. 836 (1956); Ernest F. Becher, 22 T.C. 932 (1954); and Reilly Oil Co. v. Commissioner, 189 F. 2d 382 (C.A. 5, 1951), affirming 13 T.C. 919 (1949). Cf. Joseph C. Gallagher, supra. Respondent in his brief states that if Reef is a separate taxable entity to which assets were transferred in a reorganization under section 368(a)(1)(D) *301 or by sale, the final taxable year of Reef Fields under the provisions of section 443 was the short period from July 1, 1958, through April 27, 1959, and the notice sent to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) was sent either to a nonexistent taxpayer or for the wrong taxable year. Respondent does not specifically concede that if we do not sustain his contention that the transactions here occurring constituted a recapitalization under section 368(a)(1)(E) or a mere change of identity, form, or place of incorporation under section 368(a)(1)(F), his notice of deficiency sent to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) is invalid. However, his recognition of the fact that in the absence of his being sustained on this contention the notice was sent either to a nonexistent taxpayer or for an incorrect taxable year, is tantamount to such a concession. In any event we hold that the taxable year of Reef Fields terminated on April 27, 1959, when that corporation was dissolved and that the notice sent to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) was a notice to Reef Fields for the wrong taxable *302 year, and therefore, invalid. Atlas Oil Refining Corporation, 17 T.C. 733 (1951), and Columbia River Orchards, Inc., 15 T.C. 253, 260, 261 (1950). Since the notice sent to Reef Corporation (Successor in name to Reef Fields Gasoline Corporation) is invalid, we have no jurisdiction to determine any issue in the case filed from that notice in the name of Reef Corporation (Successor in name to Reef Fields Gasoline Corporation), and this case will be dismissed for lack of jurisdiction and no determination made of the issue raised in this case with respect to the statute of limitations and the disallowance of certain expense deductions. Whether petitioner's view that Reef was a completely new corporation which purchased assets formerly belonging to Reef Fields, or respondent's view that Reef acquired the assets by a transfer to it by Reef Fields in a reorganization under the provisions of section 368(a)(1)(D) is accepted, the respondent's deficiency notice sent to Reef is a valid notice of deficiency sent to Reef for its first taxable period, December 15, 1958, through June 30, 1959, on the basis of the fiscal year adopted by Reef for keeping its books and filing its tax return. The *303 issues in the case of Reef Corporation arise from the transaction whereby Reef acquired the assets of Reef Fields. One of the questions is the basis of those assets for the computation of the allowance for depreciation. The basis for depreciation of those assets depends upon whether those assets are to be valued for the purposes of depreciation at the adjusted basis of the assets [2] *304 in the hands of Reef Fields or at the cost [3] to Reef. The proper basis of the assets for depreciation purposes depends upon whether Reef Fields sold the assets involved to Reef or, whether pursuant to a pre-arranged plan, Reef Fields transferred those assets to Reef in a reorganization which comes within the terms of section 368(a)(1)(D)[4] *305 *306 Petitioner's primary contention is that the sale by all of the stockholders of Reef Fields of their stock in that corporation to George Strong, Trustee, was a bona fide sale and should be recognized as such. If this sale is accepted as placing the ownership of all of the Reef Fields stock in George Strong, Trustee, prior to the transfer of assets by Reef Fields to Reef on February 28, 1959, petitioner states that no stockholder of Reef Fields immediately prior to the transfer was in control or even a stockholder in Reef after the transfer and therefore section 368(a)(1)(D) is inapplicable to the transfer. Petitioner contends that since section 368(a)(1)(D) is inapplicable, Reef acquired the assets of Reef Fields by purchase and the basis of those assets to Reef is their cost to Reef in accordance with the provisions of section 1012. Petitioner, in the alternative, contends that even if we do not recognize the sale by all *307 of the shareholders of Reef Fields of all of their stock to George Strong, Trustee, as a valid sale for tax purposes, the transaction nevertheless constituted a sale by Reef Fields of its assets to Reef Corporation after the adoption by Reef Fields of a resolution of dissolution followed by a dissolution by Reef Fields and distribution of all of its assets to its stockholders. Petitioner contends that under this view of the facts its position in the instant case that the basis of the assets acquired by Reef is their cost to Reef should be sustained. The facts here show that George Strong, Trustee, was selected as a person to whom stock would be transferred in a purported sale with the advance understanding of the actions which he would take thereafter. That no real ownership of stock was ever placed in George Strong, Trustee, is amply demonstrated by the facts. George Strong, Trustee, did not purchase the stock of Reef Fields in an arm's-length transaction. He did not negotiate or have a part in setting the price or terms of the sale, he furnished no consideration of his own. All the cash came from Reef Fields and his notes were matched precisely by notes of Reef. [5] His notes provided *308 expressly that on his receipt of the corresponding series notes of Reef, and his subsequent pledge of these notes, he would be relieved of all personal liability for the payment of his notes. His notes further provided that the principal and interest of his note would become due and payable proportionately as the principal and interest of the corresponding series note of Reef became due and payable. He paid no expenses, incurred no personal liability, assumed no risk, and obtained title to the stock of Reef Fields only as a conduit pursuant to a prearranged and preconceived plan under which the operating assets of Reef Fields ended up in Reef, the Butler group ended up owning all the shares of Reef stock and some notes, and the Favrot group ended up with cash and some notes. The George Strong trust created on December 11, 1958, was for the benefit of the Favrot fund, and for certain relatives of Miller, Butler and Lents. All of the details of the transaction in which George Strong, Trustee, offered to buy shares *309 of Reef Fields, including the correspondence and issuance of the George Strong notes, were handled by W. H. Simmons, the secretary-treasurer of Reef Fields and of Reef. Petitioner's reliance on such cases as John D. McKee, et al., Trustees, 35 B.T.A. 239 (1937); Clara M. Tully Trust, 1 T.C. 611 (1943); W. P. Hobby, 2 T.C. 980 (1943); Sun Properties, Inc. v. United States, 200 F. 2d 171 (C.A. 5, 1955); and Avco Manufacturing Co., 25 T.C. 975 (1956), is misplaced. These cases do not hold that a transaction in the form of a sale which in substance places none of the attributes of ownership in the purported purchaser is to be considered as a sale for tax purposes. These cases hold that the facts there present show an unrestricted sale under which complete title and control of the property involved passed for a stated price. Here, George Strong, Trustee, was not in fact a purchaser of the stock of Reef Fields. He furnished none of the funds with which the purported purchase was made and obtained no control over the property purportedly purchased. Cf. United States v. General Geophysical Co., 296 F. 2d 86 (C.A. 5, 1961), certiorari denied 369 U.S. 849. Even though we do not recognize *310 the transfer by the stockholders of Reef Fields of their stock to George Strong, Trustee, as a sale of that stock for tax purposes, Reef is entitled to use the cost of the assets transferred to it by Reef Fields as its basis for depreciation unless it is required under section 362 to use Reef Fields' basis because the assets were received in a reorganization under section 368(a)(1)(D). Respondent contends that the various transactions undertaken from December 1958 through March 1959, including the organization of Reef, the transfer of the assets of Reef Fields to Reef, the liquidation of Reef Fields, and the uninterrupted continuation of the business of Reef Fields in Reef were interrelated steps in an integrated plan of reorganization which qualifies as a tax free reorganization under section 368(a)(1)(D). [6]
Petitioner contends that the transactions as carried out in the period mentioned did not comply with the definitions relating to corporate reorganizations under sections 368 and 354. Petitioner first contends that no plan of reorganization within the meaning of section 354 was ever adopted by the stockholders of Reef Fields. Petitioner argues that the stockholders *311 of Reef Fields adopted only a plan of liquidation under section 337. We consider the letter dated December 16, 1958, to the stockholders of Reef Fields signed by J. R. Butler to set forth a detailed plan of reorganization "if the acts to be performed fall within the meaning of the term reorganization" as defined by section 368. Rawco, Inc., Ltd., 37 B.T.A. 128, 141 (1938). The plan of reorganization had been worked out in advance of the mailing of the letter and most of its terms were incorporated in this letter. Petitioner next contends that there was no reorganization under section 368(a)(1)(D) because the transactions did not comply with the language of the statute. Section 368(a)(1)(D) provides that the term "reorganization" means "a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders * * * is in control of the [transferee] corporation * * *." Here, Reef Fields transferred its assets to Reef and the owners of 52 percent of the outstanding stock of Reef Fields owned 100 percent of the stock of Reef. Section 368(a)(1)(D) further requires that stock or securities of the *312 corporation to which the assets are transferred be distributed in a transaction which qualifies under sections 354, 355, or 356. Petitioner contends that stock or securities of Reef must be distributed by Reef Fields to its shareholders in pursuance to a plan of reorganization within the meaning of sections 368(a)(1)(D) and 354(b)(1)(B). In this case all of Reef's stock was issued directly to the individuals who subscribed to the stock, the Butler group. These stockholders of Reef Fields exchanged some of their stock in Reef Fields for all of the stock of Reef but Reef did not transfer any stock to Reef Fields which Reef Fields distributed to its stockholders. Since, as a part of the overall transaction, the Butler group of Reef Fields stockholders acquired all of the Reef stock and owned all of that stock at the date of the transfer of the Reef Fields' assets to Reef, no distribution of Reef's stock by Reef Fields was required under section 354. Commissioner v. Morgan, 288 F. 2d 676 (C.A. 3, 1961), reversing 33 T.C. 30, certiorari denied 368 U.S. 836, rehearing denied 369 U.S. 826. James Armour, Inc., supra, and South Texas Rice Warehouse Company, 43 T.C. 540 (Jan. 29, 1965). *313 Petitioner next contends that the nonrecognition provision of section 354(a)(1) does not apply because securities of Reef were distributed to George Strong, Trustee, but no securities of Reef Fields were surrendered by George Strong or anyone else within the meaning of section 354(a)(2)(B). Section 356(d)(2)(B)[7] *314 provides that if no securities are surrendered then the transaction does not fall outside of section 354 but that gain will be recognized to the extent provided for by section 356(a)(1) and (2). [8] *315 Therefore, if the Reef notes were to be viewed as securities to any extent, the fact that no securities of Reef Fields were surrendered would not make the provision of section 368(a)(1)(D) inapplicable. Petitioner further contends that Reef did not acquire substantially all of the assets of Reef Fields within the meaning of section 354(b)(1)(A) because Reef Fields distributed $1,217,000 in cash to its former shareholders. All of the operating properties of Reef Fields were transferred to Reef with the exception of cash in the amount of $1,217,000. The cash distributed to the Favrot group was borrowed by Reef Fields specifically for the purpose of distribution and not for the purpose of business operation. In Milton Smith, 34 B.T.A. 702, 705 (1936) we stated: "Whether the properties transferred constitute 'substantially all' is a matter to be determined from all the facts *316 in each case rather than from the application of any particular percentage." In James Armour, Inc., supra, the cash withdrawn from the corporation by the shareholders in the transaction there involved was a greater proportion of the entire corporate assets than the cash paid out to the Favrot group in the instant case is of Reef Fields' assets. We held in James Armour, Inc., supra, that substantially all of the assets were transferred to the newly formed corporation quoting from John G. Moffatt, 42 T.C. 558 (1964), the position of that opinion which concluded with the reminder that the "substantially all" requirement "has been subjected to (a) construction which in effect applies a continuity test rather than a mere blind percentage." See Southland Ice Co., 5 T.C. 842, 850, fn. 4 (1945). Complete continuity of business enterprise at the corporate level is shown by the facts of the instant case. We hold that the amount of $1,217,000 borrowed from Life Insurance Company for the specific purpose of making a distribution of that amount to the Favrot group of shareholders and the making of such a distribution did not cause the transfer to fail to meet the "substantially all" requirement. *317 We hold that substantially all of the assets of Reef Fields were transferred to Reef. Reef Fields was incorporated in 1951 and became a successful corporation. By June 30, 1958, its earned surplus was $1,353,456. While the desire of Lents and his partners to increase their proprietary ownership in the corporation might account for the commencement of the negotiations to have the Favrot group withdraw from the corporation, we conclude from all the facts that the method adopted for accomplishing this result was for the purpose of increasing the basis. [9] of the operating assets in the hands of the new corporation without the transaction resulting in any immediate income tax on any capital gain to the Butler group of continuing stockholders from the disposition of their Reef Fields stock. In their effort to reap the advantages of an increased basis but at the same time incur no immediate tax liability from the transaction, they chose a plan which fell within the definition of a statutory reorganization. [10] *318 The cases on which petitioner relies are distinguishable on their facts from the instant case. Turnbow v. Commissioner, 368 U.S. 337 (1961), dealt with section 112(g)(1)(B) of the 1939 Code (the predecessor of section 368(a)(1)(B)) and Richard M. Mills, 39 T.C. 393 (1962), reversed 331 F. 2d 321 (C.A. 5, 1964), also involved the application of section 368(a)(1)(B). See James Armour, Inc., supra. In Edward H. Russell, 40 T.C. 810 (1963), we found that there was no reorganization because substantially all the assets of the Russell Company were not transferred to the new corporation. In Joseph C. Gallagher, supra, the owners of 61.95 percent of the stock in the old corporation acquired 72 2/3 percent of the stock in the new corporation, less than the 80 percent requirement of section 368(c). In the present case, the owners of 52 percent of the Reef Fields stock acquired 100 percent of the Reef stock satisfying the requirement of section 368(a)(1)(D) and section 368(c). We conclude that the formation of Reef by the Butler group of continuing shareholders, and the transfer of all of the operating assets of Reef Fields to Reef, and the continuity of the business enterprise *319 by Reel constitutes a corporate reorganization within the meaning of section 368(a)(1)(D) and section 354. We therefore sustain respondent in his disallowance of a portion of the deduction for depreciation claimed by Reef. The interest disallowed in the statutory notice was the interest on the Reef notes payable to George Strong, Trustee, which notes correspond to the George Strong, Trustee, notes given to the shareholders of Reef (the Butler group) and the interest differential on the notes securing the notes payable to Reef, itself. [11]
Respondent did not disallow the interest deduction on the Reef notes payable to George Strong, Trustee, which correspond to the *320 George Strong notes payable to the Favrot group (the retiring shareholders). There is no issue in this case concerning whether these notes are debt instruments. Petitioner contends that the transfer of stock of Reef Fields by both the Butler and Favrot groups of shareholders to George. Strong, Trustee, was a bona fide sale and that the notes given by George Strong, Trustee, to the shareholders of Reef Fields and by Reef to George Strong, Trustee, were regular on their face and represent true indebtednesses. We have held that the sale to George Strong, Trustee, will not be recognized for Federal tax purposes. Therefore, we will view the Reef notes on which the interest deduction was disallowed as if they were issued directly to the Reef stockholders. When in a section 368(a)(1)(D) reorganization the continuing stockholders receive, during the course of the reorganization, either money or some instrument not denominated as stock, a question arises as to the proper treatment for tax purposes of what has been received in addition to the stock of the new corporation, both from the standpoint of the stockholder and of the corporation. From the standpoint of the continuing stockholders cash *321 received by them may be considered to constitute a dividend to the extent of the earnings and profits of the transferor corporation, James Armour, Inc., supra, and South Texas Rice Warehouse Company, supra; and under certain circumstances securities of the new corporation to the extent the principal amount thereof exceeds the principal amount of securities surrendered, may be considered as taxable gain even though the transfer of property constitutes a reorganization which is otherwise nontaxable. (Section 356(d).) However, here the tax liability of the Reef shareholders is not before us for determination and therefore we have no question as to the tax effect of the issuance of the Reef notes so far as the shareholders are concerned. Nevertheless, the principles governing the determination of the nature of a document issued by a new corporation to its shareholders insofar as the corporation is concerned are similar to those governing the determination of the nature of such document insofar as the shareholder is concerned. The documents here were purportedly issued as notes in payment for the properties transferred to the new corporation and purportedly were pledged to the Reef stockholders *322 as security for the George Strong, Trustee, notes. Since we have viewed the transaction in its entirety as a reorganization under section 368(a)(1)(D), it follows that the so-called notes issued by Reef in purported payment of the properties of Reef Fields must be considered the same as notes issued for such properties to the shareholders or through the former Reef Fields to the shareholders. When these purported notes are so considered, it follows that if they are not viewed as creating an indebtedness, they constitute an equity interest in the nature of stock in the hands of the Reef shareholders. The instruments in form have many of the characteristics of notes but in substance lack many of the attributes of an indebtedness. Whether the intention of the parties was consistent with the form of the documents issued requires more than an examination of the instruments themselves. To make such a determination we must look at all the surrounding circumstances to ascertain whether the relationship created was one of indebtedness or of equity ownership. Gooding Amusement Co., 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), contiorari denied 352 U.S. 1031 (1957). A debt has *323 been defined as an unqualified obligation, payable at a reasonably close fixed maturity date irrespective of the debtor's income or lack thereof. Sherwood Memorial Gardens, Inc., 42 T.C. 211, 228 (1964), on appeal (C.A. 7, Aug. 10, 1964). The Reef Series A and B Notes payable to George Strong, Trustee, in the total amount of $1,333,000 were subordinate to a first mortgage note of $3,000,000 payable to Life Insurance Company. The C and D Notes of Reef payable also to George Strong, Trustee, in the total amount of $2,550,000 were subordinate to the second mortgage securing the Series A and B Notes. [12]
No payments of principal could be made on the Series A and B Notes until the Life Insurance Company note was fully paid except under certain circumstances if Reef's income were in excess of a stated amount. At the monthly rate of $37,500 beginning on April 1, 1959 (although the note was executed December 30, 1958), the Life Insurance Company note would not be fully paid until November 1, 1965, or nearly 7 years from *324 the date of execution. The Series A and B Notes provided that after payment of the Life Insurance Company note in full, Reef would pay on principal the same amounts that would have been paid on the Life Insurance Company note. The notes would take nearly 3 years to be fully paid at the monthly rate of $37,500. Similarly, the C and D Notes were payable at the same rate as to principal when the A and B Notes were fully paid. They would take over 5 1/2 years thereafter to be fully paid at the stated rate. For Reef to pay off the Series A, B, C, and D notes at the rate of $37,500 per month, would require over 15 years from the date of their issuance. In considering the extended period over which the notes are payable, consideration of the nature of Reef's business is appropriate. Reef is in an extractive industry limited by its casinghead gas reserves and contracts. While these Series A, B, C, and D Notes were secured by second and third mortgages, the capital they represent was at the risk of the business. These notes were issued for the operating assets of the business in effect to the continuing corporate shareholders in a reorganization under section 368(a)(1)(D). This case presents *325 not the ordinary question of "thin incorporation" but rather the question of whether the amounts denominated as debt by the continuing shareholders in a reorganized corporation are loans or venture capital. The notes were issued on a pro rata basis to the shareholders of Reef Fields who became shareholders in Reef. Reef was organized by a transfer of 3,832 shares of Reef Fields stock in return for Reef's outstanding stock. By using the system worked out in the reorganization plan, the continuing shareholders (the Butler group) could leave all of the Reef assets except the funds required to make the necessary payment to the retiring shareholders in the operation of Reef's business but hold debts from Reef representing a substantial portion of the value of those assets. As Reef's business produced earnings, a portion of its profits could be paid to its shareholders as interest which would relieve such portion of the profit from being subjected to a corporate tax, and at such time as the corporation had accumulated sufficient earnings to have paid off the mortgage to Life Insurance Company on its assets, its shareholders could begin to draw down its profits as a repayment of indebtedness, *326 at long-term capital gain rates. While there is nothing wrong with planning a transaction in a manner designed to produce the minimum amount of taxes, such a transaction must be scrutinized for its substance. Where the substance of the transaction is to leave the capital represented by a purported indebtedness at the risk of the business until the business has accumulated sufficient earnings that such earnings may be withdrawn without handicap to the business operation, such purported indebtedness in substance is a further equity investment in the business. See Sherwood Memorial Gardens, Inc. supra. The Butler shareholders entered the transaction owning approximately 52 percent of the common stock in Reef Fields which had a capital stock stated value of $408,000 and earned surplus of $1,353,456. At the conclusion of the transaction the same shareholders owned 100 percent of the common stock of Reef (all the operating assets having been transferred into Reef). The stated value of the common stock of Reef was $500,000, earned surplus was reduced to $75,276 and the Butler group held Series A Notes in the amount of $1,093,500 and C Notes in the amount of $1,093,500. The funds represented *327 by these notes were the operating assets and funds of the business or its risk capital. The shareholders of Reef Fields who became the sole stockholders of Reef may not transmute an equity interest into a creditor interest through a transfer of assets to their new corporation, merely by calling the documents issued to them "notes" when the funds represented by those documents are the necessary assets to carry on the business operation. On the basis of all the facts in this case we hold that as to the shareholders of Reef the debt instruments actually represented a properietary interest and sustain respondent in his disallowance of the claimed interest deduction to Reef. See and compare Sherwood Memorial Gardens, Inc., supra, and Aqualane Shores, Inc. v. Commissioner, 269 F. 2d 116 (C.A. 5, 1959), affirming 30 T.C. 519. Petitioner makes no argument specifically directed to the disallowance of the interest differential on the Reef notes securing the George Strong notes payable to Reef. In effect this is merely a payment into the George Strong trust, and petitioner has not shown that a deduction should be allowed for such a payment. We sustain respondent's disallowance of this amount *328 of $598.75. The reason for respondent's disallowance of the deduction of the amount of $88.52 claimed by Reef as the amortizable part of its organization expense is not fully explained by respondent in his brief. On its income tax return for the period December 15, 1958, to June 30, 1959, Reef elected to treat as deferred expenses its organization expenditures incurred during the taxable period. Reef claimed that the amount of $88.52 representing only 4 months (March to June 1959) or four-sixtieths of a total expenditure of $1,327.77 was deductible during that fiscal period. Respondent apparently does not contest the method of computation or the amount of such expenses, but contends only that the expenditures are part of the reorganization and are not deductible under section 248. [13] *330 Section 248 provides that a corporation may elect to amortize organizational expenditures as deferred expenditures over a period of not less than 60 months. Respondent's position on this issue appears to be contrary to his regulations. Section 1.248-1(b)(4), Income Tax Regulations, provides: Expenditures connected with the reorganization of a corporation, unless directly incident to the creation of a corporation, *329 are not organizational expenditures within the meaning of section 248 * * *. The claimed organizational expense of $88.52 represents four-sixtieths of $1,327.77, the amount representing legal fees and costs incident to the creation of Reef. Such expenses appear to be those directly incident to Reef's organization and therefore precisely the type of expenses which respondent's regulations state are deductible under section 248. We hold that respondent erred in disallowing Reef's claimed deduction of $88.52 as the portion of its organizational expenses deductible in its fiscal period December 15, 1958, through June 30, 1959, under section 248. Decision in Docket No. 788-63 will be entered under Rule 50. Order will be entered dismissing Docket No. 789-63 for lack of jurisdiction. Footnotes
1. All references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. SEC. 362. BASIS TO CORPORATIONS. * * *
(b) Transfers to Corporations. - If property was acquired by a corporation in connection with a reorganization to which this part applies, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain recognized to the transferor on such transfer. This subsection shall not apply if the property acquired consists of stock or securities in a corporation a party to the reorganization, unless acquired by the issuance of stock or securities of the transferee as the consideration in whole or in part for the transfer. 3. SEC. 1012. BASIS OF PROPERTY - COST. The basis of property shall be the cost of such property, except as otherwise provided in this subchapter and subchapters C (relating to corporate distributions and adjustments), * * * ↩
4. SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS. (a) Reorganization. - (1) In general. - For purposes of parts I and II and this part, the term "reorganization" means - * * *
(D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under section 354, 355, or 356; (E) a recapitalization; or (F) a mere change in identity, form, or place of organization, however effected. * * *
(c) Control. - For purposes of part I (other than section 304), part II, and this part, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. SEC. 354. EXCHANGES OF STOCK AND SECURITIES IN CERTAIN REORGANIZATIONS. (a) General Rule. - (1) In General. - No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. (2) Limitation. - Paragraph (1) shall not apply if - (A) the principal amount of any such securities received exceeds the principal amount of any such securities surrendered, or (B) any such securities are received and no such securities are surrendered. * * *
(b) Exception. - (1) In general. - Subsection (a) shall not apply to an exchange in pursuance of a plan of reorganization within the meaning of section 368(a)(1)(D), unless - (A) the corporation to which the assets are transferred acquires substantially all of the assets of the transferor of such assets; and (B) the stock, securities, and other properties received by such transferor, as well as the other properties of such transferor, are distributed in pursuance of the plan of reorganization.↩
5. The notes of Reef corresponded to the George Strong, Trustee, notes with the exception of the one-fourth of 1 percent interest differential in favor of George Strong, Trustee.↩
6. See footnote 4.↩
7. Sec. 356(d). Securities as Other Property. - For purposes of this section - (1) In general. - Except as provided in paragraph (2), the term "other property" includes securities. (2) Exceptions. - (A) Securities with respect to which nonrecognition of gain would be permitted. - The term "other property" does not include securities to the extent that, under section 354 or 355, such securities would be permitted to be received without the recognition of gain. (B) Greater principal amount in section 354 exchange. - If - (i) in an exchange described in section 354 (other than subsection (c) thereof), securities of a corporation a party to the reorganization are surrendered and securities of any corporation a party to the reorganization are received, and (ii) the principal amount of such securities received exceeds the principal amount of such securities surrendered, then, with respect to such securities received the term "other property" means only the fair market value of such excess. For purposes of this subparagraph and subparagraph (C), if no securities are surrendered, the excess shall be the entire principal amount of the securities received. ↩
8. SEC. 356. RECEIPT OF ADDITIONAL CONSIDERATION. (a) Gain on Exchanges. - (1) Recognition of gain. - If - (A) section 354 or 355 would apply to an exchange but for the fact that (B) the property received in the exchange consists not only of property permitted by section 354 or 355 to be received without the recognition of gain but also of other property or money, men the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property. (2) Treatment as dividend. - If an exchange is described in paragraph (1) but has the effect of the distribution of a dividend, then there shall be treated as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be treated as gain from the exchange of property.↩
9. The original basis of assets to Reef Fields of $8,950,000 had been depreciated to $3,880,000. ↩
10. See Conference Report No. 2543 to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., P. 41 (1954).
11. The interest disallowed was computed as follows: Series A Notes $1,093,500.00 at 5 3/4
percent for 6 mos.
$31,438.13
Series C Notes $1,093,500.00 at 6 1/4
percent for 6 mos.
34,171.87
Total
$65,610.00
Interest differential of one-fourth of
1 percent between the George
Strong, Trustee notes and the
Reef Series B and D Notes
pledged to secure George Strong,
Trustee, Series B and D Notes
to Reef
$ 598.75
It is obvious that the remaining interest on these notes would be offsetting, Reef including as interest the amount offset by its payment.↩
12. The Series E and F Notes were noninterest bearing and they are not involved in respondent's determination that the deduction of interest on the other notes was improper.↩
13. SEC. 248. ORGANIZATIONAL EXPENDITURES. (a) Election to Amortize. - The organizational expenditures of a corporation may, at the election of the corporation (made in accordance with regulations prescribed by the Secretary or his delegate), be treated as deferred expenses. In computing taxable income, such deferred expenses shall be allowed as a deduction ratably over such period of not less than 60 months as may be selected by the corporation (beginning with the month in which the corporation begins business). (b) Organizational Expenditures Defined. - The term "organizational expenditures" means any expenditure which - (1) is incident to the creation of the corporation; (2) is chargeable to capital account; and (3) is of a character which, if expended incldent to the creation of a corporation having a limited life, would be amortizable over such life. (c) Time for and Scope of Election. - The election provided by subsection (a) may be made for any taxable year beginning after December 31, 1953, but only if made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof). The period so elected shall be adhered to in computing the taxable income of the corporation for the taxable year for which the election is made and all subsequent taxable years. The election shall apply only with respect to expenditures paid or incurred on or after the date of enactment of this title.